UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA                    CRIMINAL NO. 3:05CR252(TPS)

v.

MARK EASTER                                 January 9, 2006

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

On September 30, 2005, the defendant, Mark Easter, pleaded guilty to a two-count information charging him with discharging raw sewage and untreated sludge into the Thames River and Long Island Sound, in violation of 33 U.S.C. § 407.  Count One charges Easter with the unlawful discharge of raw sewage and untreated sludge from the Motor Vessel ("M/V") *Race Point*; Count Two charges Easter with the unlawful discharge of raw sewage and untreated sludge from the M/V *Munnatawket*.  Easter is scheduled to be sentenced on January 18, 2006, at 10:00 a.m.  The Government respectfully submits this Memorandum in Aid of Sentencing.

### INTRODUCTION

The Government concurs with the Probation Office's offense level computation, which is set forth at paragraphs 21 through 30 of the Presentence Report (PSR).  The Government further agrees with the Probation Office's conclusion that Easter is in Criminal History Category I, *see* PSR at ¶ 32, and that the applicable Guidelines sentencing range is 10 to 16 months.  *See* PSR at ¶ 56.  While the Government has no objection to the fine range of $3,000 to $36,500,000, *see* PSR at ¶ 61, the Government acknowledges the difficulty of calculating a precise maximum fine where, as here, the statute imposes a fine for each day of violation, and the violations occurred more or less continually over the course of several years.  Finally, the Government also agrees

with the Probation Officer's assessment that Easter's "rationalization for the instant offense still

does not explain his conduct." *See* PSR at ¶ 67.

## I.     RELEVANT BACKGROUND FACTS

### A.     Offense Conduct in This Case.

The offense conduct in this case is set forth in a detailed stipulation that is incorporated

into the plea agreement and also included in the PSR.  *See* PSR at ¶¶ 6-16.  There are several

facts that are especially important for purposes of sentencing.  First, the offenses of conviction

were continuing offenses that occurred over the course of several years, 2000 to 2004.  Because

the overboard discharge valves on the M/V *Race Point* and the M/V *Munnatawket* were left

open, raw sewage and untreated sludge were more or less continually flowing into the Thames

River and Long Island Sound while the vessels were underway throughout the period of time in

question.  The Coast Guard estimates that at least 472,000 gallons of sewage and sludge were

discharged.  Second, Easter took affirmative steps to conceal from the United States Coast Guard

the fact that the two vessels were in violation of federal regulations relating to the overboard

discharge of raw sewage, untreated sludge, and other wastewaters.  *See* Stipulation of Offense

Conduct at ¶¶ 6-8.  Third, when confronted by Coast Guard personnel investigating these

continuing violations, Easter repeatedly lied.  *See* Stipulation of Offense Conduct at ¶¶ 9-11.

### B.     The Defendant's Statement.

Easter provided a written statement to the Probation Office regarding his involvement in

the offenses of conviction, which is set forth at paragraph 18 of the PSR.  In sum, Easter

attributes the conduct underlying his criminal behavior to nothing more than negligence.  His

statement reads, in pertinent part, as follows:  "The root cause of Mr. Easter's problem that led to

- 2 -

this prosecution was his inability to delegate and his failure to recognize the importance of maintaining the lavatory system.  The defendant had many duties as the Operations Manager and unfortunately, low on his list of priorities was the pumping out of the lavatory waste."  *See* PSR at ¶ 18.  For the reasons set forth below, the Government submits that this explanation is illogical and reflects a lack of remorse and contrition for Easter's criminal conduct.

## II.    SENTENCING AFTER *BOOKER*

In *United States v. Booker*, __ U.S. __, 125 S. Ct. 738 (2005), the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004).  The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury.  As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines to be effectively advisory.  This ruling results in a system in which the sentencing court, while required to consider the Guidelines, may impose a sentence within the statutory maximum penalty for the offense of conviction.  The sentence will be subject to appellate review for "reasonableness." *See Booker,* 125 S.Ct. at 764-766.

In *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Second Circuit summarized the impact of *Booker* as follows:

> First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a). Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (i) to impose the sentence that would have been

- 3 -

imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, *or (ii) to impose a non-Guidelines sentence.* Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

*Id.* at 113 (emphasis added). In other words, a sentencing now involves two analytic stages: first, a determination of the applicable Guideline range (including any departures); and second, a determination of whether in light of the Guidelines and the other factors listed in Section 3553(a), there is any reason to impose a non-Guidelines sentence. The Second Circuit emphasized the continuing significance of the Guidelines, stating that "*Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *Id.* at 113.

## III.  THE COURT SHOULD IMPOSE A NON-GUIDELINES SENTENCE WITH RESPECT TO A TERM OF IMPRISONMENT

The parties have agreed, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, that a sentence that includes a term of imprisonment of 30 days is a reasonable and appropriate disposition of this case. *See* Plea Agreement at 3. The Court may, of course, accept or reject this proposed disposition. *See* Rule 11(c)(1)(C), Fed. R. Crim. P. If the Court were to accept the proposed disposition in this case, the Court would sentence Easter to a term of imprisonment of 30 days each on Counts One and Two, to run concurrently.

Title 33, United States Code, Section 411 prescribes that if a district court imposes a sentence that includes a term of imprisonment for a violation of Section 407, that term of imprisonment must not be less than 30 days nor more than one year on each count of conviction. Under the Sentencing Guidelines, Easter would be subject to a term of imprisonment of 10 to 16 months. *See* PSR at ¶ 56. In order to effectuate the disposition proposed in the plea agreement,

- 4 -

then, the Court would have to depart downward or, alternatively, impose a non-Guidelines sentence. The Government is not aware of any circumstances that would warrant a downward departure. Accordingly, the Government recommends that the Court impose a non-Guidelines sentence, as permitted by *Booker* and *Crosby*. Although the Government does not ordinarily recommend that the Court impose a non-Guidelines sentence, the Government believes that such a sentence is appropriate in this case. Specifically, the Government believes that the deterrent effect of this prosecution will best be preserved where there is the *certainty* that the defendant will serve a term of imprisonment, even if that term of imprisonment is less than the applicable Guidelines range.

## IV.     THE COURT SHOULD IMPOSE A SIGNIFICANT FINE

In addition to a term of imprisonment, the Court may impose a sentence that includes a monetary fine. The statute in question, 33 U.S.C. § 411, provides for a fine of up to $25,000 per day. Based on this daily rate, the Probation Office has calculated the Guidelines fine range to be $3,000 to $36,500,000. *See* PSR at ¶ 62. There is no agreement between the parties as to the appropriate amount of the fine.

A.     The Section 3553(a) Factors.

In order to determine an appropriate sentence, including an appropriate fine, the Court must consider the history and characteristics of the defendant and the nature and circumstances of the offense of conviction. In this regard, Section 3553(a) requires a sentencing court to consider, among other factors, the following:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct[.]

*See* 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(B).  These factors weigh heavily in favor of a significant monetary fine.

    B.    <u>The Offenses of Conviction Were Serious Environmental Crimes.</u>

The United States Coast Guard has estimated that during the period of time from 2000 through 2004, the defendant's unlawful actions led to the discharge of approximately 472,000 gallons of raw sewage into the Thames River and Long Island Sound.  *See* PSR at ¶ 16 (This is a conservative estimate since it only takes into account discharges during the months of June through October, even though the Fishers Island Ferry operated year-round).  The prolonged discharge of sewage, sludge, and wastewaters into waters that are used by many people for fishing, boating, swimming, and other recreational and commercial activities clearly posed a significant public health and safety risk.

    C.    <u>Easter Deliberately Caused the Unlawful Discharges.</u>

More significant for sentencing purposes is the fact that Easter *deliberately* caused the unlawful discharge of sewage and sludge.  As set forth in the Stipulation of Offense Conduct, Easter

> directed and commanded that the overboard discharge valves for the sewage holding tanks on the M/V *Race Point* and the M/V *Munnatawket* be unlocked and maintained in the open position while these vessels were in port and while they were transiting between New London and Fisher's Island.  The defendant knew that unlocking the overboard discharge valves and maintaining them in the open position would allow raw sewage and untreated sludge to be discharged into the Thames River and Long Island Sound.

- 6 -

*See* Stipulation of Offense Conduct at ¶ 6.  This conduct, which continued over the course of at

least four years, reflects the defendant's utter disregard for the health and safety of other persons

who, like himself, used the Thames River and Long Island Sound for their livelihood or for

recreation.

        D.     <u>Easter Deceived the Coast Guard.</u>

In fashioning an appropriate sentence, the Court should also consider the fact that in order

to continue committing the offenses of conviction over the course of several years, Easter had to

deceive the Coast Guard into believing that he was in fact complying with the applicable

regulations regarding the disposal of lavatory waste from the vessels under his command.  The

Coast Guard conducted annual inspections of the vessels of the Fishers Island Ferry.  Because

these inspections were pre-announced and scheduled in advance, Easter had an opportunity to

conceal from the Coast Guard the fact that the vessels were not complying with regulations

regarding the discharge of sewage and wastewaters into the Thames River and Long Island

Sound:

> Before the pre-announced Coast Guard inspections, the defendant would order
> subordinate crew members and Fisher's Island Ferry employees to close and lock the
> overboard discharge valves for the sewage holding tanks on the M/V *Race Point* and the
> M/V *Munnatawket*.  The purpose for doing this was to deceive Coast Guard inspectors
> into believing that the M/V *Race Point* and the M/V *Munnatawket* were complying with
> Coast Guard regulations for Type III sanitation devices and not unlawfully discharging
> raw sewage and untreated sludge into the Thames River and Long Island Sound.
> Following the conclusion of the pre-announced Coast Guard inspections, the defendant
> would order subordinate crew members and Fisher's Island Ferry employees to unlock
> and open the overboard discharge valves for the sewage holding tanks on the M/V *Race
> Point* and the M/V *Munnatawket*.

*See* Stipulation of Offense Conduct at ¶ 8.  It was only on July 13, 2004, when the Coast Guard

conducted an *unannounced* inspection of the M/V *Race Point* and the M/V *Munnatawket*, that

- 7 -

Easter's criminal conduct came to light.  *See* Stipulation of Offense Conduct at ¶ 9.  Even after

his illegal activity had been discovered, Easter attempted to continue the deception by lying to

Coast Guard personnel in the course of two separate post-inspection interviews on July 13, 2004,

and July 16, 2004.  *See* Stipulation of Offense Conduct at ¶ 10.

     E.     Easter's Explanation Reflects a Lack of Contrition and Remorse.

Easter's explanation that his criminal conduct resulted from his "inability to delegate and

his failure to recognize the importance of maintaining the lavatory system," *see* PSR at ¶ 18, is

illogical and inconsistent with his own admissions.  Citing his responsibilities as Operations

Manager of Fishers Island Ferry, Easter claims that pumping out the lavatories was "low on his

list of priorities."  *See* PSR at ¶ 18.  These statements suggest that Easter was too busy to focus

on certain necessary but less important tasks.  In fact, the question of how the Fishers Island

Ferry would dispose of lavatory waste was sufficiently high on Easter's "list of priorities" that he

ordered (*i.e.*, "delegated") his crew to close and lock the overboard discharge valves in

preparation for multiple scheduled Coast Guard inspections.  When the inspections were over

and the Coast Guard personnel had left the vessels, Easter would order the crew to unlock and

open the overboard discharge valves.  *See* Stipulation of Offense Conduct at ¶¶ 7-8.  These

machinations, undertaken by the Fishers Island Ferry crew at Easter's command, reflect not an

ignorance of the importance of the proper and lawful disposal of lavatory waste, but rather a keen

awareness, on Easter's part, of how important these inspections actually were to the Coast Guard

and an attentiveness to deceiving the Coast Guard over the course of at least four years.

The purpose of closing and locking the overboard discharge valves was nothing less than

an effort, by Easter, to impede and impair the ability of the Coast Guard to enforce environmental

regulations under its jurisdiction.  Thus, Easter's criminal conduct did not arise from negligence, poor time management techniques, or insufficient attention to detail; it was a conscious decision to violate the law, to dump sewage and sludge into the Thames River and Long Island Sound, and to conceal these actions from the Coast Guard.

Although the Government is not contesting Easter's entitlement to a two-level adjustment for acceptance of responsibility under U.S.S.G. § 3E.1(a), the Government submits that he has not provided the Court with "a credible and complete explanation, evincing remorse or contrition, for the conduct surrounding the . . . offense of conviction." *United States v. Reyes*, 9 F.3d 275, 280 (2d Cir. 1993) (affirming district court's denial of adjustment for acceptance of responsibility where defendant's "account of the offense of conviction was indeed deeply suspect.") (internal quotations omitted).  The Court can and should take this into account in determining a just and appropriate fine.

## V.    CALCULATING AN APPROPRIATE FINE

The Government respectfully recommends that the Court impose a fine that is commensurate with the seriousness of the offenses of conviction and with Easter's ability to pay. For the reasons set forth above, the Government submits that the offenses of conviction, while misdemeanors, were nonetheless serious crimes.  It should be noted in this regard that Easter's offense conduct also incorporated actions that could have been charged as felonies under 18 U.S.C. § 1001.  *See* Stipulation of Offense Conduct at ¶ 10.  As to ability to pay, Easter has a significant net worth and monthly cash flow, which would enable him to pay a large fine.

Since the offenses of conviction came to light on July 13, 2004, Easter has suffered no adverse employment consequences.  He continues to be employed by the Fishers Island Ferry District and is reportedly the highest paid municipal employee in the Town of Southold, New York, with an annual salary of approximately $130,000.  By resolution adopted on October 25, 2005, the Town Board of the Town of Southold  "*calls upon the Commissioners of the Fishers Island Ferry District to initiate appropriate disciplinary proceedings against any employee* that has pled guilty or been found guilty in connection with the discharging of raw sewage and untreated sludge into the Thames River and Long Island Sound in violation of the laws of the United States."  (Emphasis in original).  The Fishers Island Ferry District has oversight responsibility for the operations of the Fishers Island Ferry, including the employment of all Ferry personnel.  As of this date, the Government is not aware of any such disciplinary proceedings against Easter.  Based on this and other information, the Government expects that Easter will continue his employment with the Fishers Island Ferry even after he serves his sentence.

Under the Sentencing Guidelines, Easter would be exposed to a term of incarceration of 10 to 16 months.  *See* PSR at ¶ 56.  Under the terms of the plea agreement, if accepted by the Court, he will serve one month of incarceration.  In that event, Easter's Guidelines sentence will have been reduced by nine to 15 months.  Were he to receive a Guidelines sentence, Easter would be unable to report for work and, therefore, unable to collect his salary (assuming he cannot use accrued leave), resulting in a measurable monetary loss.  If the Court accepts the plea agreement, however, Easter will not face this consequence, resulting in a significant net benefit to him.  The Court may use this net benefit as the basis for calculating an appropriate fine.

Finally, the Government respectfully submits that the Court impose a fine that would serve as an effective deterrent to others who might be inclined to engage in similar criminal conduct. The prospect of a prison sentence, coupled with a large fine, would significantly advance the goal of general criminal deterrence, which is one of the goals of sentencing. *See* 18 U.S.C. § 3553(a)(2)(B).

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court impose a non-Guidelines sentence that includes a term of imprisonment of 30 days on each count of conviction, to run concurrently, and a fine that is commensurate with the seriousness of the offenses and Easter's ability to pay, and that would also effectively deter others from engaging in similar criminal conduct.

<div style="margin-left:40%">

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


By:    DEBORAH R. SLATER
       ASSISTANT UNITED STATES ATTORNEY
       Federal Bar No. ct04786

For:    JOHN A. MARRELLA
       ASSISTANT UNITED STATES ATTORNEY
       157 Church Street
       New Haven, CT 06510
       Tel. (203) 821-3700
       Federal Bar No. ct19473

</div>

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a copy of the foregoing Motion has been sent by fax and U.S. mail, postage prepaid, this 9th day of January, 2006, to:

Hubert J. Santos, Esquire
Santos 7 Seely, P.C.
51 Russ Street
Hartford, CT 06106
(860) 724-5533

and by hand delivery to

Julmarie J. Egan
United States Probation Office
157 Church Street
New Haven, CT 06510

By: _____
DEBORAH R. SLATER
ASSISTANT UNITED STATES ATTORNEY

For: JOHN A. MARRELLA
ASSISTANT UNITED STATES ATTORNEY